IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2021 Session

## STATE OF TENNESSEE v. LLOYD CRAWFORD

**Appeal from the Criminal Court for Shelby County**
No. 17-02526          Chris Craft, Judge
_____

**No. W2019-02056-CCA-R3-CD**
_____

The Defendant-Appellant, Lloyd Crawford, was convicted by a Shelby County Criminal Court jury of first-degree felony murder, attempted first-degree murder, employing a firearm during the commission of a dangerous felony, attempted especially aggravated robbery, and tampering with evidence. See Tenn. Code Ann. §§ 39-13-202 (first-degree murder), 39-12-101 (criminal attempt), 39-17-1324 (employing a firearm), 39-13-403 (especially aggravated robbery), 39-16-503 (tampering with evidence). The trial court imposed a total effective sentence of life plus seventeen years. On appeal, the Defendant asserts that the evidence is insufficient to sustain his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Eric J. Montierth, Memphis, Tennessee, for the Defendant-Appellant, Lloyd Crawford.

Herbert H. Slatery III, Attorney General and Reporter; Ronald H. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose F. Leon and Melanie Cox, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This case arises from an incident on December 31, 2016, when the Defendant, his codefendant, Andrew Ellis, and a third man, Muwani Dewberry, attempted to rob and subsequently murder the victim, Keith Crum. Crum was able to escape with a gunshot wound to the hand, but Dewberry was shot and killed during the encounter.

At the July 16, 2019 trial, Regina Sessel testified that she was Dewberry's mother. A photograph of Dewberry was published for the jury. Sessel agreed that she had done "everything [she] could to assist" detectives in solving her son's murder.

Memphis Police Department ("MPD") Officer Windless[1] testified that he was working as a patrolman when he responded to a "shooting call" on December 31, 2016. At the scene, he was one of the first officers to arrive at the dead-end street and saw a "male black subject, l[]ying on the ground, bleeding." He said that the man lying on the ground was "moaning" and "wasn't pretty much saying anything" before paramedics began to render aid. On cross-examination, Officer Windless stated that he did not know who had made the 911 call about the shooting.

MPD Officer Nathan Newman testified that he also responded as a patrolman to the shooting scene on December 31, 2006. He explained that he was unable to find any witnesses to the shooting despite "speak[ing] with at least one neighbor." Officer Newman testified that that neighbor had surveillance cameras outside of her property, but he was unable to retrieve video footage from the neighbor because she "forgot [the passcode,] and [he] couldn't figure it out." He affirmed that he did not arrest anyone for the crime on December 31, and there were no "suspects or any information." On cross-examination, Officer Newman stated that he did not "participate in the other evidence gathering" at the crime scene.

Bobbie Gant testified that she was the neighbor who had spoken with Officer Newman about her surveillance cameras. She explained that other officers later took the entire surveillance system with her consent. She did not know the Defendant or codefendant. On cross-examination, Gant stated that officers were not able to retrieve video footage from the surveillance system, except from one particular camera.

MPD Officer Charles Cathey testified that he was working as a crime scene investigator when he was called to the shooting scene on December 31, 2016. Officer Cathey identified photographs of a bloodstain on the sidewalk. He explained that he did not collect any evidence from the crime scene because "[t]here was nothing there to collect." After leaving the crime scene, Officer Cathey went to the hospital to collect Dewberry's clothing.

MPD Sergeant Steven Easterwood testified that he was one of the investigators assigned to the shooting. He affirmed that it was raining on the day of the shooting. He stated that he also was unable to retrieve video footage from Gant's surveillance system.

---

[1]We note that Officer Windless' first name does not appear anywhere in the record on appeal. We mean no disrespect by its omission.

He took Gant's system with her permission and "tagged it in [the MPD] property and evidence room." Sergeant Easterwood explained that after Dewberry was pronounced deceased, the investigation transferred to the MPD homicide unit. On cross-examination, Sergeant Easterwood agreed that he did not know where the shooting had actually occurred.

MPD Lieutenant Clifton Dupree testified that he was a homicide sergeant in 2016 and was assigned to investigate Dewberry's death. He explained that "Sergeant Noel from homicide" was the lead officer in the investigation. Sergeant Noel was able to obtain video from Gant's surveillance camera, which Lieutenant Dupree also viewed. He stated that the video depicted "a car pull[ing] up . . . . You see someone get out of the car on the passenger's side and then you see some motion and then you see the car." The video then showed the person get back in the car and "you see the car drive away. And at that point you can tell there's something that was left on the side of the road." The video was played for the jury. Lieutenant Dupree testified that he looked through crime reports that had "matching elements" to what he saw in the video footage. He found a robbery report involving "three suspects in a silver car" from the same day as the shooting, which had been reported by Keith Crum. Lieutenant Dupree reported his findings to Sergeant Noel. On cross-examination, Lieutenant Dupree testified that he did not know who had made the 911 call regarding the shooting.

Bryttanie Burris testified that she was the mother of the Defendant's child. She stated that she noticed the Defendant had taken her silver BMW sedan from his mother's house on the night of December 30, 2016. The Defendant returned the silver sedan on the morning of December 31, 2016. Burris said that the Defendant returned her vehicle with "a busted [rear] window[,]" and "it had been cleaned." When Burris asked the Defendant how her window had been broken, he told her that his girlfriend "busted [the] window because . . . she thought he was back messing with [Burris]." Burris affirmed that police had later taken her vehicle into custody as evidence in the shooting. On cross-examination, Burris agreed that her car did not have any damage other than the broken rear window when the Defendant returned it to her.

Keith Crum testified that on December 31, 2016, he was standing on his front porch when "a silver four-door car" pulled in front of his house. He then approached the vehicle and spoke to the person in the passenger seat. Crum explained that the passenger "asked for someone" who no longer lived at the residence. The passenger then asked about "cush" for "his partner in the back seat[,]" which Crum described as "the expensive form of marijuana." Crum informed them that he might know someone who could sell them some for $325, but the passenger said it was too expensive. Crum then spoke to the driver of the vehicle, who said "he wanted some weed." Crum offered to sell the driver "a gram and a half" out of his "'smoke weed[.]'" He explained that "smoke weed" was marijuana that he

- 3 -

would "normally use for [him]self." After going in his house to get the marijuana, Crum "got into the back [passenger] seat of the car." There were three other men in the vehicle. The driver gave Crum a $50 bill, and Crum gave him a "gram and a half" and "$30 in return." The driver then asked if his mother-in-law was the "candy lady," and he affirmed that she was. Crum explained that the "candy lady" was "a person that pretty much sells snacks, chips, drinks, cigars, cigarettes, food, [and] beverages" from her home. He then went to exit the vehicle but was unable to open the door because it "was on child safety." The passenger then began firing a gun at Crum.

Following the first gunshot, Crum reached for the gun, placing his hand over the barrel, and the passenger "fired the gun two more times." The driver then told the back passenger to "go in [Crum's] pockets." Crum "smacked" the back passenger's hand away from his pockets, and the passenger fired the gun "five other times[.]" The passenger then screamed, "Bro. Bro, you hit. Bro, you hit" at the back passenger. Crum then remembered he also had a gun on him, but it had fallen "on to the back seat," and he was unable to use it. He then "screamed, 'Please don't kill me. Please don't kill me. I'll give y'all this.'" Crum was then "able to roll the window down" and "jump[] out the window, leaving . . . [his] left shoe and the gun in the car[.]" He stated that the Defendant was in the passenger seat, and his codefendant was in the driver seat. Dewberry was in the back-passenger seat. Crum said he did not see anyone other than the Defendant with a gun. Upon exiting the car via the window, Crum "immediately ran back across the street" to his house, where his fiancée called 911. The silver BMW "fled the scene, going back for the freeway."

After his fiancée called 911, Crum was transported to Regional One Hospital to treat a gunshot wound to his left hand. He began feeling pain in his hand "when the second or third shots went off" but did not realize he had been shot until he returned to his house. Crum ultimately had to have surgery on his hand because of the gunshot wound. He showed the scar from the shooting to the jury. He affirmed that he had received another, less noticeable gunshot wound to the same hand while "showing someone . . . how [he] received the first injury[.]" Crum spoke to police before being transported to Regional One and gave them a description of silver car and its occupants. He spoke to police a second time after the shooting, and he identified the Defendant, codefendant, and Dewberry in a photographic lineup. Crum stated that he had continued pain in his left hand, sometimes making him unable to lift his daughter. He further stated that he worked as a cook but had trouble "lift[ing] dishes up" at work and was sometimes unable to form a fist with his left hand.

On cross-examination, Crum stated that he thought a total of eight shots were fired while he was inside the car. He was only struck once in his hand. On cross-examination by the codefendant's counsel, Crum explained that Dewberry was shot while he was struggling with the Defendant, and the gun was "randomly shooting, openly firing" while

- 4 -

Crum tried to get the gun away from the Defendant. On redirect examination, Crum agreed that he still thought about the shooting and replayed the incident in his mind. On recross-examination, Crum stated that he did not have anything in his pockets during the shooting, and therefore nothing was taken from his pockets.

MPD Officer Nacarious Lucas testified that he responded to Crum's 911 call on December 31, 2016. Officer Lucas affirmed that Crum was able to give him a "description of the vehicle" and "a brief description" of the three suspects. Officer Lucas described Crum's demeanor as "very hyper, upset, and hurting." He agreed that Crum was shot in the left hand and was bleeding when he arrived on scene.

T.D.[2] testified that he was Dewberry's nephew. He stated that he was 13 years old on December 31, 2016. He said that he and Dewberry were staying at his grandmother's house that day. T.D. testified that he saw Dewberry "around eight" in the morning leaving a third-floor apartment in their grandmother's apartment complex with "Boosie and Ant." He identified the Defendant as "Boosie" and the codefendant as "Ant." T.D. said Dewberry was armed when he saw him leaving the apartment. Dewberry then got into the backseat of a "grey BMW," while the Defendant got into the driver's seat. The codefendant got into "a grey Nissan Maxima." Dewberry then exited the BMW to change clothes inside his grandmother's apartment. When he emerged from the apartment, he was wearing "[a]ll black." The Defendant then drove away in the BMW, while Dewberry and the codefendant left the apartment complex in the Nissan. T.D. affirmed that he had spoken to police on January 8, 2017, regarding what we had seen. T.D. stated that despite having been previously "sustained delinquent" on a facilitation of aggravated robbery charge, he "kn[e]w what the truth [wa]s" and had testified truthfully.

On cross-examination, T.D. stated that he knew his uncle was armed when he saw him because he saw a gun "hanging off his hip." On redirect examination, T.D. agreed that he never saw the Defendant or the codefendant in the neighborhood again after his uncle was killed.

MPD Sergeant John Stone testified that he was working as a crime scene investigator at the time of the shooting. He was assigned to process the silver BMW. Sergeant Stone took photographs of the vehicle, dusted for fingerprints, and tested for blood. Photographs of the vehicle were received as exhibits. He stated that there was a black garbage bag taped over the broken "vent window" of the left rear passenger door when he processed the vehicle. Sergeant Stone identified photographs of the presumptive blood test on the BMW, showing "the presence of possible blood" on the driver's door handle, driver's floorboard, front passenger seat, the passenger floorboard, the glove box,

---

[2]It is the policy of our court to refer to minors by their initials only.

the center armrest, rear driver's side seat, and rear driver's side floorboard. He agreed that even "if someone had tried to clean the area where the blood was and you couldn't see it" with the naked eye, the chemicals in the presumptive blood test would make it visible. Sergeant Stone also found presumptive blood on floormats he found in the vehicle's trunk. On cross-examination, Sergeant Stone agreed that there were "[n]o [bullet] holes whatsoever" in the BMW, and the only defect in the car was the broken vent window.

MPD Sergeant Russel Noel testified that he was part of the homicide unit in 2016 and was assigned to investigate Dewberry's death. Sergeant Noel stated that he had investigated the security system footage received from Gant. The footage's time stamp was "off an hour." In the footage, Sergeant Noel saw a vehicle "stop roughly where the victim was located," and a man got out of the passenger-side door, "removed the victim from the vehicle, placed him on the sidewalk, the passenger got back in the vehicle, and they left." Sergeant Noel noted that the "vent window was busted out" on the driver's side.

Sergeant Noel "did research on the vehicle" in the footage and eventually learned that Burris owned the silver BMW. Sergeant Noel went to Olive Branch, Mississippi, to speak to Burris. He noticed that her BMW had a broken vent window. Burris "gladly gave up the vehicle[,]" and Sergeant Noel had the BMW towed to the MPD "crime scene tunnel." He stated that "all four seats had blood on them." Fingerprints were recovered from the vehicle but were unusable. Sergeant Noel spoke with Dewberry's family members and began investigating robberies in the area with three suspects. Through this investigation, he learned of Crum's robbery and shooting.

Sergeant Noel testified that he spoke with T.D. and Rhia Perry, the codefendant's girlfriend, and developed the Defendant and codefendants as "persons of interest." Sergeant Noel issued a "Be on the Lookout" alert ("BOLO"), and the codefendant was subsequently apprehended. The Defendant later turned himself in. Sergeant Noel stated that there were "[at]t least ten fire stations" and "[a]t least one hospital" between where Dewberry was shot and where his body was found. He elaborated that the hospital was "literally 30 seconds" from the scene of the shooting, while the place where Dewberry's body was found was "[a]t least 10 to 15 minutes, minimum" from the scene of she shooting.

MPD Officer Michael Jackson testified that he was informed that the codefendant was seen walking down the street on January 13, 2017. After a foot chase, codefendant was apprehended. Officer Jackson also spoke with Perry, who had a room at the Sun Inn, near where the codefendant was apprehended. He said she was cooperative and allowed officers to search her room.

MPD Officer Bradley Parker testified that he assisted in searching for the codefendant on January 13, 2017. He ultimately located the codefendant hiding under a house and apprehended him.

Dr. Marco Ross was accepted by the court as an expert in forensic pathology. Dr. Ross testified that he was the keeper of records for the medical examiner's office and had reviewed the records from Dewberry's autopsy. He explained that Dewberry had a "gunshot wound of the head[,]" which entered above his left ear, went through "the left side of his brain," and exited "in the midline" on the back of his head. Autopsy photographs were received as exhibits.

Dr. Ross stated that the gunshot wound was the cause of death, explaining that it caused "swelling of the brain" which affected "the respiration . . . and cardiac centers of the brain." The manner of death was homicide. Dr. Ross testified that the injury was potentially survivable, noting that Dewberry had "some verbal and motor activity when he was first evaluated at the hospital[.]" He agreed that it was "possible that there may have been some improvement" in Dewberry's condition if he had been immediately taken to the hospital. Dewberry did not have any preexisting conditions or diseases. Dr. Ross agreed that Dewberry's gunshot wound was consistent with the anatomical position of being shot by someone in the front passenger seat while "sitting in the back seat of a car" with his head turned to the left.

On cross-examination, Dr. Ross agreed that "there was no stippling near the entrance wound." He explained that stippling occurred when shot from "a range as close as half inch . . . up towards of three to four feet[,]" depending on the type of handgun used. On redirect examination, Dr. Ross stated that Dewberry's head was probably cleaned at the hospital, which would not "remove stippling[, but i]t could potentially remove soot."

Rhia Perry testified that she had grown up with the Defendant and was dating the codefendant in December 2016. She stated that Dewberry was the father of her cousin's four children. Perry explained that on December 31, 2016, she was staying at her previously-mentioned cousin's apartment, which was on the third floor of the complex. She saw the Defendant, codefendant, and Dewberry at the apartment that morning. They were "talking about going . . . to this dude named Dread's house" to rob him. She saw Dewberry get "a black ski hat or whatever[,] and he cut the eyes off of it." She saw the codefendant with a gun, and he then got another gun "out of a duffle bag" and gave it to Dewberry. The trio then left the apartment. Perry testified that the codefendant returned to the apartment "30 to 45 minutes" later in his silver Nissan Maxima.

Perry testified that when the codefendant returned to the apartment, he was "panicking real bad[.]" The codefendant informed her that Dewberry had been shot in the

head while in a car, but "he was still breathing[.]" Perry spoke with Sergeant Noel "maybe two or three" days later. She affirmed that she stopped staying at her cousin's apartment and went to the Sun Inn "[a]t some point[.]" Perry testified that a couple weeks after Dewberry was killed, the codefendant came to visit her at the Sun Inn. He left to walk to the store and never returned. Perry stated that police came to her room later that night, and she cooperated with them and allowed them to search her room. Perry agreed that she was in jail at the time of trial for "three different theft cases" and had previous convictions for criminal impersonation and failure to appear in a felony case. She stated that the State had not made her any promises in exchange for her testimony.

On cross-examination, Perry stated that she did not know "Dread's" real name but had seen him before. She testified that she and the codefendant were no longer dating at the time of trial and had only dated for "maybe two weeks" before Dewberry was killed and broke up shortly after. She elaborated that when the codefendant returned to the apartment on December 31, 2016, he was "real fidgetive [sic]," was "hesitant to say what he wanted to say[,]" and was "scared[.]"

On redirect examination, Perry testified that when the codefendant returned to the apartment, he told her that the trio had not robbed "Dread" because he was not home. The trio then left "Dread's" house and "went to East Memphis" where they were "supposed to have been going to buy some weed . . . from some guy." The codefendant told her that "a robbery was supposed to take place" and that Dewberry was shot when he and "the guy" struggled. The codefendant told her that he was "the driver" during the "robberies." Perry did not see the Defendant after December 31, 2016, and she did not see the codefendant after he visited her at the Sun Inn.

On recross-examination, Perry stated that she did not know who Crum was. On further redirect examination, Perry stated that upon returning to the apartment, the codefendant told her that Dewberry had been shot and that "they had put [Dewberry's] body out[,] and they called 911 and told 911 where he was and then broke the phone." On further recross-examination, Perry affirmed that the codefendant told her about Dewberry's shooting in person while they were sitting in his silver Nissan Maxima.

The Defendant and codefendant elected not to testify. Following the close of all proof, the Defendant was convicted of felony murder, attempted first-degree murder, employing a firearm during the commission of a dangerous felony, attempted especially aggravated robbery, and tampering with evidence. The trial court imposed an effective sentence of life plus seventeen years. This timely appeal followed.

## ANALYSIS

On appeal, the Defendant contends that the evidence is insufficient to support any of his convictions. He asserts that Crum's account of what occurred in the car "is both completely implausible[] and is directly at odds with the physical evidence in the case." He elaborated that "the jury's decision to accredit Crum's testimony is not reasonable[.]" The State responds that "the evidence presented at trial was more than sufficient to support the verdicts[,]" and "credibility is for the jury to determine[.]" We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

A. First Degree Felony Murder. As relevant to the instant case, first-degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). No culpable mental state is

required for conviction of felony murder except the intent to commit the underlying felony. Id. § 39-13-202(b). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a).

In the instant case, the Defendant asserts that Crum's testimony was too "unbelievable" for a rational juror to "accredit Crum's account of events in the car." He goes on to say that Crum's testimony "requires too many inferential leaps and too much suspension of belief" to support the Defendant's convictions. However, as noted by the State and as frequently noted by this court, choosing to accredit a witness is completely within the province of the jury. State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) ("The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact."). We may not reweigh or reconsider the jury's assessment of Crum's credibility on appeal, regardless of the Defendant's assertion that Crum must have "superhuman bullet dodging reflexes[.]"

Viewed in the light most favorable to the State, the evidence demonstrates that Dewberry, the Defendant, and the codefendant prepared to rob someone named "Dread." When they were unable to find him, the trio went to Crum's house. Once Crum agreed to sell the trio marijuana and got into the silver BMW, the Defendant began shooting and shot Crum in the hand, while Dewberry attempted to remove items from Crum's pockets. The Defendant screamed that Dewberry had been "hit." Following the shooting, the Defendant and codefendant drove to a dead-end street and left Dewberry there. Dr. Ross testified that Dewberry had died after being shot in the head in a manner that was consistent with Crum's testimony. Upon our review, the evidence was sufficient for a rational jury to conclude that the Defendant shot and killed Dewberry while attempting to rob Crum. The Defendant is not entitled to relief.

B. Attempted First-Degree Murder. As relevant in this case, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2). First degree murder is the unlawful, intentional, and premeditated killing of another. Tenn. Code Ann. § 39-13-202(a)(1). The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing Bland, 958 S.W.2d at 660); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon,

preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660.

In the instant case, as we have previously stated, the evidence showed that the Defendant, codefendant, and Dewberry prepared to commit a robbery. When they were unable to find their intended target, they went to Crum's house. Crum's interaction with the trio was friendly until he realized he could not open the door to exit the BMW. Crum testified that the Defendant then pointed his handgun at him and fired multiple shots at close range, striking him in the hand. Crum belatedly remembered he also had a firearm, but he was unable to access it because it had fallen from his hip. When he was finally able to raise it, it struck the seat in front of him and fell to the floor. He was ultimately forced to leave his weapon in the vehicle when he escaped through the window. Viewed in the light most favorable to the State, a rational jury could have found the Defendant guilty of attempted first-degree murder beyond a reasonable doubt. The Defendant is not entitled to relief.

C. Employing a Firearm During the Commission of a Dangerous Felony. Tennessee Code Annotated section 39-17-1324 prohibits armed dangerous felonies. It is an offense to employ a firearm during the commission of or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b). Attempt to commit first degree murder is statutorily defined as a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(A). Viewed in the light most favorable to the state, a rational trier of fact could have determined that the Defendant fired a gun at Crum. Thus, the evidence is sufficient to support the conviction, and the Defendant is not entitled to relief.

D. Attempted Especially Aggravated Robbery. As we have previously stated, robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. When "accomplished with a deadly weapon" and when "the victim suffers serious bodily injury," a robbery is elevated to especially aggravated robbery. Tenn. Code Ann. § 39-13-403. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense" either "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part" or "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(2), (3).

Viewed in the light most favorable to the State, the evidence shows that the Defendant shot at Crum while he instructed Dewberry to remove items from his pockets. Crum testified that he had to have surgery on his hand following the incident and that he still had recurring pain in his hand. He was sometimes unable to lift his daughter, lift dishes while working as a cook, or form a fist. He showed his permanent scar to the jury. The evidence is sufficient for a rational jury to infer that the Defendant intended to commit a theft using violence through use of a deadly weapon and that Crum suffered serious bodily injury. The Defendant is not entitled to relief.

E. <u>Tampering with Evidence</u>. Finally, as relevant to the instant case, it is "unlawful for any person, knowing that an investigation or official proceeding is pending or in progress," to "alter, destroy, or conceal any . . . thing with intent to impair its verity, legibility, or availability as evidence in the investigation[.]" Tenn. Code Ann. § 39-16-503(a)(1). Viewed in the light most favorable to the State, the evidence showed that the Defendant cleaned the silver BMW after the shooting before returning it to Burris. Sergeants Noel and Stone testified that the vehicle had been cleaned, but evidence of blood was found throughout the BMW using a presumptive blood test, including on the floormats that had been cleaned and placed in the vehicle's trunk. A reasonable jury could infer that when the Defendant cleaned the BMW, he knew that an investigation would be pending and that he cleaned the car in order to destroy law enforcement's ability to find evidence of the shooting in the vehicle. The Defendant is not entitled to relief.

## CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE